1                    UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF CONNECTICUT

3     - - - - - - - - - - - - - - - - x
                                      :
4     SHARON ISSETT,                  :   No. 3:14CV1698(RNC)
        INDIVIDUALLY AND ON BEHALF    :
5       OF OTHER SIMILARLY            :
        SITUATED INDIVIDUALS,         :
6                                     :
                          Plaintiff,  :
7                                     :
               vs                     :
8                                     :
      AETNA LIFE INSURANCE CO., ET AL,:
9                                     :   HARTFORD, CONNECTICUT
                          Defendants. :   SEPTEMBER 13, 2017
10    - - - - - - - - - - - - - - - - x

11                          ORAL ARGUMENT

12
          BEFORE:
13
                   HON. ROBERT N. CHATIGNY, U.S.D.J.
14

15    APPEARANCES:

16        FOR THE PLAINTIFF:

17                NICHOLS KASTER PLLP
                      4600 IDS Center
18                    80 South 8th Street
                      Minneapolis, Minnesota 55402
19                BY:  RACHHANA T. SREY, ESQ.
                      REBEKAH L. BAILEY, ESQ.
20
          FOR THE DEFENDANTS:
21
                  JONES DAY
22                    250 Vesey Street
                      New York, New York 10281
23                BY:  MATTHEW W. LAMPE, ESQ.
                      WENDY C. BUTLER, ESQ.

24

25                                    Darlene A. Warner, RDR-CRR
                                      Official Court Reporter

1

2                        <u>10:08 A.M.</u>

3

4              THE COURT:  Good morning.  We're here for oral

5      argument on the cross motions for summary judgment.

6              Would you please state your appearances for the

7      record.

8              MS. BAILEY:  Good morning, Your Honor, Rebecca

9      Bailey from Nichols Kaster.

10             MS. SREY:  From Nichols Kaster, Rachhana Srey on

11     behalf of plaintiffs as well.

12             MR. LAMPE:  Good morning, Your Honor, Matt Lampe

13     with Jones Day on behalf of Aetna.

14             MS. BUTLER:  Good morning.  Wendy Butler with

15     Jones Day on behalf of Aetna.

16             THE COURT:  Good morning.

17             You have submitted extensive papers in support

18     of these cross motions, and I appreciate the efforts you

19     have put into your papers.  You're welcome to make

20     whatever presentations you wish this morning.

21             Have you talked about who should go first?

22             MR. LAMPE:  We have not discussed that, Your

23     Honor.

24             MS. BAILEY:  No.

25             THE COURT:  Okay.  Well, why don't we give

1    plaintiff's counsel the opportunity to go first.

2                MS. BAILEY:  Thank you, Your Honor.

3                May I use your podium?

4                THE COURT:  Sure.

5                MS. BAILEY:  Good morning again.

6                It is the defendants' burden to prove each and

7    every element of the two affirmative defenses at issue in

8    the parties' cross motions for summary judgment.  To grant

9    plaintiff's motion in its entirety, however, the Court

10   need only answer "no" to two questions.

11               First, as to the administrative exemption:  Is

12   plaintiff's primary job duty of utilization review related

13   to the running of the business?  No.

14               As to the professional exemption:  Does

15   utilization review require RN level knowledge?  It

16   doesn't.

17               There is no dispute between the parties as to

18   what plaintiff's primary job duty is.  It is utilization

19   review for appeals.

20               To qualify as administratively exempt,

21   plaintiff's job duty must relate to the running of the

22   business, also referred to as general business operations.

23   That means it has to be the kind of work that every

24   company must undertake in order to function.  It's not

25   industry-specific work.

1            It's back-office work.  It's those familiar

2      functions like accounting, human resources, legal,

3      marketing, tech, auditing.  Those are functions that every

4      company must do in some capacity.  Utilization review does

5      not qualify.

6            Now, defendants try to shoehorn it in by

7      analogizing it to three different administrative

8      functions, and none of those work on the record.

9            The first is quality review.  Plaintiff's not

10     reviewing Aetna's process for quality.  She's performing

11     frontline work reviewing customer's actual request for

12     coverage in realtime.  There's a whole separate department

13     of people conducting quality review.  They actually audit

14     plaintiff's work.  So she is not performing quality

15     control.

16           The next one they analogize it to is legal and

17     regulatory compliance.

18           Plaintiff doesn't create the policies or

19     procedures that Aetna uses to follow the law.  It's her

20     job to follow the policies and procedures that Aetna --

21     that is made at Aetna by other people.  So that doesn't

22     work.

23           The third one they use is health and safety.

24     I'm not entirely sure how that analogy is supposed to

25     work.  Health and safety usually relates to employee

1    health and safety like OSHA requirements.

2              It's true that Aetna's an insurance company, but

3    it's not true that everyone who works for an insurance

4    company is administratively exempt.

5              Utilization review is not the type of work that

6    every company must undertake in order to function.

7    Instead, it's work related to the day-to-day carrying out

8    of the company's affairs; in this case specifically the

9    affairs in each insurance agency in the insurance market.

10   Utilization review is a necessary part of the ongoing

11   process of providing members with benefits.

12             Defendant makes the argument that no one buys

13   insurance for the purpose of receiving utilization review

14   coverage.  Sure.  But they do buy insurance for the

15   purpose of one day receiving coverage, and in order to get

16   coverage you need to have an authorization review.

17             In that way, utilization review is very

18   analogous to underwriting for someone who is looking for a

19   loan from a mortgage company.  No one gets a loan for the

20   purpose of underwriting services, but to get that loan

21   they need to undergo underwriting.

22             And that's something that the Second Circuit

23   looked at in Davis and found that underwriters are not

24   administratively exempt because their work was related to

25   the day-to-day carrying out of the company's affairs.

1        So on a related note in the insurance context,

2    this district, in Neary, found that insurance adjustors

3    don't qualify as administratively exempt for similar

4    reasons.  And some of the language was adopted -- the

5    Second Circuit in Davis adopted some of this language from

6    Neary.

7        If you look outside of the circuit, you'll see

8    that the Fourth Circuit in Calderon found that special

9    investigators whose job it was to gather facts for the

10   purpose of determining whether fraud exists in insurance

11   claims, that those didn't meet the first prong of the

12   priority duty test under the administrative exemption as

13   well.  You will see it in other analogous contexts:  Auto

14   appraisers, medical examiners, case managers.

15       So the Court should treat utilization review

16   similarly here, because that work is the day-to-day

17   carrying out of Aetna's insurance services, not the kind

18   of work that every company must undertake in order to

19   function.

20       Now, defendant's going to talk to you about the

21   second -- the last prong, which is the discretion and

22   independent judgment prong with respect to matters of

23   significance.  They have to meet every one of these

24   elements.

25       And all I'm going to say about that right now,

1    because the parties do extensively brief that, is that the

2    Court should bear in mind when reviewing those arguments

3    that this is an insurance company, and Aetna has to insure

4    consistent review of requests for medical services.

5         They have a national accreditation which

6    requires them to implement policies and procedures to

7    ensure predictable outcomes.  They settled a lawsuit over

8    a decade ago in which they agreed to implement policies

9    and practices to insure consistent results.

10        And so this job by design was created to

11   eliminate the type of discretion and independent judgment

12   that they're trying to show you now here today.

13        For example, they enact step-by-step workflows,

14   they require the use of objective evidence-based criteria

15   rather than opinion, and they perform routine audits of

16   the utilization review process to ensure that the proper

17   result was reached.

18        So for that additional reason, there was no --

19   any sort of decision-making exercise for plaintiff in this

20   case doesn't rise to the level of discretion on

21   independent judgment with respect to matters of

22   significance necessary under the administrative exemption.

23        Now, as to the professional exemption, there is

24   no dispute that plaintiff did not engage in bedside

25   nursing.  She was not working for Aetna in a clinical

1    setting.  So the question really boils down to whether the

2    utilization review primary duty requires as a minimum job

3    requirement RN level knowledge or whether it requires

4    something less.

5           And we see from the record that at Aetna both

6    RNs, like the plaintiff, and LPNs perform this utilization

7    review function for appeals.  They work on the same teams

8    with the same managers.  They receive the same types of

9    appeals to review.  There is no situation where RNs get

10   harder appeals to review.  They get the same reviews from

11   the same round-robin process.  They use the same

12   workflows, they consult the same criteria, and they report

13   their results on the same templates.  They even swap

14   schedules, because they're assigned these expedited

15   reviews, they can swap schedules between an LPN and an RN.

16   It doesn't matter.  They're treated the same.

17          This matters to the purpose of the professional

18   exemption because this exemption requires you to look at

19   the minimum job requirement.  It's not enough that Aetna

20   shows you that plaintiff has an RN degree.  They have to

21   show you that an RN degree is necessary to perform this

22   job.  And for all the reasons I just told you, it's not.

23          THE COURT:  In their reply brief, Aetna says

24   that Aetna expects ANCs to independently determine whether

25   treatments are medically necessary, which ANAs cannot do.

1           MS. BAILEY:  Both LPNs and RNs make the same

2     decision.  They both decide whether or not criteria is

3     met.  The only difference is what happens to the review or

4     the appeal once the review is completed.

5           That doesn't alter the quality of their primary

6     duty.  It's the same duty.

7           And I submit to you that if you look at

8     defendants' arguments on the discretion on judgment prong,

9     the advanced-knowledge prong, you'll see what I mean.

10    You'll see that they're trying to find discretion in the

11    fact that plaintiff, as they argue, uses her nursing

12    knowledge to review a medical file.

13          So do LPNs.

14          They also argue that plaintiff uses her

15    discretion when choosing criteria.

16          So do LPNs.

17          They say she has to use judgment in order to

18    determine whether or not criteria are met.

19          Well, to the extent that that is true, so do

20    LPNs.

21          The only difference is what happens next.

22          When criteria is met, an LPN has to send the

23    review to a medical director.  When criteria is met, an RN

24    might have to send it to a medical director if it's from a

25    specific state or a specific type of procedure, or they

1    might be able to send it along for claims processing.

2    Make no mistake though, if criteria is not met, they both

3    have to send it to a medical director.

4            So it's only in the narrow instances where the

5    fate of the appeal is different, but the fate of the

6    appeal does not alter the primary job duty itself.

7            THE COURT:  Aetna says that it entrusted the

8    plaintiff to make independent, unsupervised decisions that

9    committed Aetna to paying claims in the hundreds of

10   thousands of dollars, which ANAs could not do.

11           MS. BAILEY:  ANAs worked independently too.

12   Like I said, it just goes on to a medical director.

13           And the case law is pretty clear that the

14   monetary value of a particular decision doesn't alter

15   whether or not there's discretion in independent judgment

16   being exercised -- or discretion and judgment, rather, in

17   the context of the professional exemption.

18           So one other thing that the Court could look to

19   is the fact that utilization review at other companies is

20   routinely performed by RNs and LPNs without any sort of

21   distinction in where the review goes after -- where the

22   appeal goes after the review is complete.

23           You'll see there's a case, Clark versus Centene,

24   out of the Fifth Circuit, there LPNs and RNs performed the

25   same utilization review work.

1          THE COURT:  But that case in the Fifth Circuit

2     explicitly states that the court is not addressing the

3     first element of the three-part test at issue here.

4          MS. BAILEY:  Right.  It's all interrelated.  You

5     don't need to get to the first element.  It's one whole

6     sentence.  The whole idea of it being three elements is

7     confusing, to me at least.

8          But in order to start talking about advanced

9     knowledge and discretion on judgment, it all needs to be

10    met.  So if the type of discretion and judgment we're

11    talking about for the purpose of advanced knowledge isn't

12    the type that is derived for a prolonged course of

13    specialized instruction, RN education, then it doesn't

14    matter.

15         So they didn't have to go there because the

16    defendant in Centene didn't meet the third prong, the

17    educational requirement.  That's the same case here.  You

18    don't even have to get to discretion on judgment because

19    LPNs can do the same primary job duty and do do the same

20    primary job duty at Aetna.

21         THE COURT:  Did the case managers in the Clark

22    case have the ability to make independent, unsupervised

23    decisions that could involve hundreds of thousands of

24    dollars?

25         MS. BAILEY:  Yes.

1           THE COURT:  The case managers had that?

2           MS. BAILEY:  Yes.

3           THE COURT:  They didn't have to submit their

4    decisions for review by others?

5           MS. BAILEY:  They did if criteria was not met.

6    And that's true everywhere because it's a legal

7    requirement.  If criteria isn't met, a medical doctor has

8    to look at it.

9           But, yes, the LPNs in Clark versus Centene were

10   able to approve the requests if criteria was met.

11          THE COURT:  Well, it seems that in the context

12   of the case law and the regulations, I need to determine

13   whether the ability of the plaintiff to make an

14   independent, unsupervised decision is sufficient to bring

15   her within the scope of this exemption.

16          MS. BAILEY:  I'm not conceding that she did make

17   independent and unsupervised decisions that rise to the

18   level of discretion on judgment customarily exercised by

19   an RN.  Remember, she doesn't do bedside nursing here, she

20   doesn't talk to patients and develop care plans or assess

21   them, so it doesn't meet that standard, and we argue that

22   pretty extensively in the brief.

23          But the regulations also make clear that there

24   is no distinction between recommending a decision and

25   making a decision.  And that regulation is usually

1    something cited by defendants, right, because they're

2    usually saying:  A-ha, it's enough discretion because

3    they're making a decision, and it doesn't matter that it

4    gets checked by someone high up.

5           But for the purpose of comparing and contrasting

6    LPNs to RNs here, that regulation makes very, very clear

7    that in the eyes of the law, in the eyes of the

8    professional exemption, it's no different that RNs make

9    the decision and it goes on to processing, in some

10   situations, versus LPNs making the decision and it goes on

11   to a medical director.

12          They're still reviewing the file, looking for

13   the facts that apply to the criteria in determining

14   whether criteria is met regardless of whether they're an

15   appeals nurse consultant or appeals nurse associate.

16          THE COURT:  Would your position be the same if

17   Aetna required a medical doctor to perform the utilization

18   review?

19          MS. BAILEY:  No.  The record isn't super

20   developed on this point, but it's pretty clear in the way

21   that the law is developed at the state level that the

22   doctors do more than what the RNs do here.  They can go

23   outside the bounds of the criteria.  In fact, that's what

24   they're there for.  They're there to be the doctor, to

25   make sure there's no other reasons why this isn't

1    medically necessary.

2              So I can't really -- on the basis of the record,

3    we don't have a bunch before us -- but that analogy

4    doesn't work.  The actual medical directors themselves do

5    have much broader discretion.  And they're doctors, which

6    is treated differently under the professional exemption as

7    well.  Doctors and lawyers have their own treatment, so

8    that doesn't work.

9              THE COURT:  Okay.

10             MS. BAILEY:  Okay.  So for that clear reason

11   alone, and looking at Clark versus Centene, the Court

12   should hold that the primary duty of utilization review

13   doesn't require RN-level knowledge.  It requires LPN-level

14   knowledge, and they cannot meet the professional

15   exemption.

16             So thank you, Your Honor.

17             THE COURT:  Thank you.

18             MR. LAMPE:  Your Honor, if I may, let me pick up

19   on the point that you were questioning counsel about with

20   respect to the distinction between what the RN can do and

21   what the LPN can do.

22             It's important for the Court, in analyzing this

23   distinction, to look at the job that the plaintiff was in

24   and what the requirements of that job were.  And the

25   plaintiff, Ms. Isett, was in an ANC job, a nurse

1        consulting job.  And it's very clear in the record that it

2        was very important to Aetna that those individuals be able

3        to independently make assessments and independently make

4        decisions, and decisions of significance obviously because

5        they involve so much money and obviously they're important

6        to the insured.

7                But it was the independence that was important,

8        and the record reflects the reason why, and it's that the

9        business model that Aetna had for that particular position

10       wanted to minimize the need for doctor involvement.  And

11       that's why the nurses in that position needed to

12       independently make those decisions.  It was not sufficient

13       to have somebody who would require review.  The whole

14       point of it was to have doctors less involved.

15               So the question becomes, under the third prong

16       of the professional exemption, whether that level of

17       knowledge necessary to independently make these decisions

18       is customarily acquired through an RN program.

19               The Pippins case from the Second Circuit, which

20       is very helpful in elucidating the professional exemption,

21       talks about how the word "customarily" is very important.

22       It's the key term.

23               Here it's easy to conclude that the education

24       required to make the independent determinations would be

25       that at the RN level.  The Court needs to look no further

1    than all of these laws out there that define and

2    distinguish between RNs and LPNs.  And they all have a

3    common theme, which is that the RN-level position and

4    program is one that teaches individuals to act

5    independently, whereas the LPN program prepares people

6    only to act under close supervision.

7              So it's certainly a very easy step to take, and

8    we would encourage the Court to take this step, to

9    conclude that, customarily, individuals who are going to

10   have the training to independently make these decisions

11   are going to have to have had the RN-level education.  The

12   LPN-level education isn't sufficient.

13             The test is not whether there could be some

14   stray, random LPN out there who is capable of performing

15   the ANC job, the nurse consultant job, without the RN

16   level of education.  That's not the test.  Pippins even

17   addresses this.  It focuses on the word "customarily," and

18   it focuses on what generally is in existence at the

19   company.  And here, not only is there a perfectly logical

20   reason to assume that the RN-level knowledge would be

21   required, given the difference between these two programs

22   and this issue of independence, but all of the ANCs at

23   Aetna have an RN-level education.

24             In Pippins the court said, if there were one or

25   two of these accountant's positions that did not have the

1   advanced degree, that would not eliminate the --

2   disqualify these employees for the exemption, because the

3   vast majority of these accountants did have the advanced

4   degree.  Well, at Aetna, all of them have the advanced

5   degree.

6           Ms. Isett herself has a bachelor's of science in

7   nursing.  It's a four-year degree.  She had an active

8   license as an RN.  The position description for the

9   company required an RN degree and an RN license.  That

10  fact is a fact that distinguishes the Centene case, where

11  on the Centene position description it specifically said

12  "RN or LPN."We don't think that the Court should draw any

13  conclusions based on Centene in light of that.

14          I don't recall there being anything in the

15  record in the Centene published decisions indicating that

16  the LPNs could make the type of decisions that the RNs

17  make at Aetna.  I don't recall there being any record on

18  that.  But even if there were, these are two completely

19  different companies.

20          And in the Centene case, a manager testified,

21  and this was highlighted in the Fifth Circuit decision,

22  that the type of decisions that are made are very

23  straightforward, strictly applying the facts to the

24  standards, and that there was not a need for the exercise

25  of discretion.

1            So we don't know exactly what the Centene system

2    was, how it operated, what their standards were, but

3    there's no record before the Court that would indicate

4    that there was any sort of similarity between that company

5    and this company.

6            The Court should look at what Aetna required.

7    Aetna required independence.  And it's completely logical

8    that Aetna would have required an RN level of knowledge in

9    order to perform that job.

10           That's the third element under the professional

11   exemption.

12           The second element under the professional

13   exemption is not in dispute.  Plaintiffs do not dispute

14   that the RN profession is in the, quote, field of science

15   or learning.

16           The only remaining element under the

17   professional exemption is the first element relating to

18   whether the plaintiff needs to rely on her education and

19   background as an RN in order to do the job, and whether or

20   not she makes in her job the -- exercises the type of

21   discretion and judgment that's characteristic of the

22   profession.

23           And we would submit, Your Honor, that this is a

24   very straightforward couple of issues based on what

25   plaintiff testified in her own deposition.  She admitted,

1      and it's not surprising, she admitted that she drew on her

2      knowledge, her education, her schooling, and her

3      experience as an RN in performing her job.

4              Her job was to assess patient information and

5      reach conclusions about whether certain treatment or

6      certain hospitalization was medically necessary.  She

7      admitted that she drew on her background and education as

8      an RN, and it would be shocking if she denied that.  So

9      she clearly drew on her RN knowledge and experience and

10     education in making those decisions.

11             And the types of decisions that she made are

12     certainly characteristic -- that's the term from

13     Pippins -- characteristic of the individuals in that

14     profession.

15             Two points on that.

16             Plaintiff admits it.  She admits that the type

17     of assessments that she made at Aetna were very similar to

18     the assessments that she made in a clinical setting in a

19     hospital.  Again, it's not surprising, because at Aetna

20     she was analyzing patient information and reaching

21     conclusions about medical necessity and the like.

22             There are also -- the nurse practice acts that

23     we cited to, that not surprisingly define the RN job as

24     one that's involved in making assessments and diagnoses

25     and reaching conclusions based on data and the like.

1           So we would submit that the first element, as

2     defined by Pippins, is satisfied; the third is satisfied;

3     and the second is not in dispute, in that Ms. Isett is

4     exempt, she falls squarely within the professional

5     exemption.

6           I'll turn to the administrative exemption unless

7     Your Honor has questions about the professional.

8           THE COURT:  That's fine, thank you.

9           MR. LAMPE:  With respect to the administrative

10    exemption, it may seem strange that an individual would be

11    qualified for two different exemptions.  This actually is

12    addressed in the administrative exemption at 541.201, when

13    it talks about the functional areas that typically qualify

14    as a job being related to general business operations.

15          That paragraph specifically says the individuals

16    who do these -- who work in these functional areas may

17    well qualify for another exemption.  And Ms. Isett is that

18    type of an individual.  She qualifies for two of the

19    exemptions.

20          The first element of the administrative

21    exemption is directly related to business operations.  And

22    counsel focused a lot on the Davis case and on the

23    insurance adjustor case, the appraiser case, Neary and

24    Calderon.

25          We would urge the Court to look at the

1      regulations.  The regulations specify the typical areas

2      that qualify as general business operations.  Counsel

3      mentioned some but not all.

4              Legal and regulatory compliance, health and

5      safety, quality review, employee benefits, these are all

6      areas that would typically qualify as general business

7      operations.  These are areas where Ms. Isett worked.

8              With respect to this distinction between Davis

9      and this case, I actually think the Davis case nicely

10     underscores why Ms. Isett, in fact, does fit within the

11     functional areas that qualify for the general business

12     operation prong.  There's just a very significant

13     distinction between the Davis plaintiff and this

14     plaintiff.

15             In Davis, the plaintiff was an underwriter of

16     loans for a company that was in the business of selling

17     loans.  And the court found that the plaintiff did not

18     satisfy general business operations and rather was on the

19     production side because he was selling the loans, and he

20     was -- his performance was measured by, in part, by how

21     many loans he sold.

22             That makes all the sense in the world.  If

23     that's your business, selling loans, you would want to

24     measure your salespeople by how many loans they sell.

25     That makes perfect sense.

1          That's not this case.

2          This case is a back-end operation.  Ms. Isett

3     was not involved in selling insurance.  She was not

4     evaluated based on how many insurance policies she sold.

5     She was part of the apparatus that Aetna has in place to

6     resolve disputes.  And in a complex area like health

7     insurance, with all the technological advances and the --

8     just expansion of the field of medicine, it is not

9     surprising there will be gray areas, and it's not

10    surprising that there will be disputes.

11         Ms. Isett worked in that disputes realm.  She

12    worked at the second step of the disputes realm.  She only

13    became involved if benefits had been denied.

14         So there's already a denial of benefits and a

15    disagreement.  And that develops at the first step.  And

16    if there's been a disagreement, a dispute, then the

17    insured or the provider has the ability to appeal that.

18         And that's where Ms. Isett gets involved.  She

19    gets involved in making sure that the company is correctly

20    deciding whether or not the benefits are covered.  And

21    certainly in the process of doing that, she is looking out

22    for the company's compliance with their policies, with the

23    law.  She's part of that apparatus.  She's dealing with

24    employee benefits.  She does extensive research, which is

25    part of the record.  That's another one of the function

1    areas as mentioned.  And in a sense, she's doing quality

2    review because she is taking a second look at a decision

3    that has already been made at the frontline.

4              Resolving disputes -- it's ashame there ever is

5    a dispute -- but resolving disputes isn't what the company

6    sells.  It's in the business of selling insurance

7    products, or it's in the business of administering

8    third-party insurance products, in which case the

9    regulations in the law instruct that you're supposed to

10   look at general business operations from the standpoint of

11   the customer.

12             So we're talking about companies in all sorts of

13   different industries.  Ms. Isett is administering their

14   plans.  She certainly is not involved in the production

15   work of those companies.  And that's how the law instructs

16   that the Court is supposed to look at general business

17   operations when you're -- when the Court's dealing with a

18   customer in a situation like that.

19             So an analogy perhaps from Davis that would be

20   apt would be somebody who's responsible for selling

21   insurance policies and whose performance is based on those

22   number of sales.  It's not -- the analogy from Davis to

23   Ms. Isett is not apt at all.  They're completely different

24   functions.

25             With respect to the discretion and independent

1    judgment, we think the record is very clear that these are

2    discretionary decisions that Ms. Isett needs to make in

3    the course of deciding whether a particular patient -- and

4    she admits that each one's file is different, they're

5    never the same.  That's not surprising.  They're

6    complicated files, they're different.  And she has to

7    decide for each one of those whether the treatment that's

8    in question that has been denied already is medically

9    necessary, whether it's more beneficial than harmful.

10            She has to make these decisions.  And in the

11   course of doing so, according to her own admissions, she

12   has to decide, first of all, which criteria to look at.

13   She has to decide how to apply that criteria.  She has to

14   make the ultimate decision as to whether or not the

15   treatment is medically necessary when someone else has

16   already determined that it is not.

17            All of those things are part and parcel of her

18   job.  But I would like the Court to focus on just the one

19   thing alone that establishes discretion in judgment, that

20   Ms. Isett does not focus on at all, and that has to do

21   with Ms. Isett's job of recommending changes to the

22   policies, and changes to the protocols and the criteria.

23   Clearly that is a discretionary function.

24            There's no evidence of any kind from the

25   plaintiff that there's some sort of software program or

1    checklist that tells an ANC when a policy or a criteria or

2    a guideline needs to be fixed.  There's no aids at all.

3           And Ms. Isett testified at page 145 of the

4    deposition, lines 21 through 24, that she frequently makes

5    recommendations about changing policies and protocols and

6    guidelines, clearly a discretionary activity, clearly a

7    matter of significance, because it is recommendations to

8    change, in fact, the infrastructure in which the company

9    works.  The recommendations were accepted, according to

10   the record, and this is the type of thing that -- that's

11   discretionary.  And it's a matter of significance, and she

12   does it frequently.

13          And I would submit to the Court that the Court

14   focus on how much discretion and judgment is necessary.

15   And the regulation is very clear that once you've

16   identified the primary duty, which the plaintiff says is

17   handling appeals, it needs to only include the exercise of

18   discretion and judgment.

19          Ms. Isett, by her own admission frequently makes

20   these recommendations for improvement on policies.  That

21   is certainly enough to meet the includes test.

22          Counsel has argued at various points that that's

23   not anything that was expected.  The job -- the position

24   description for the ANC job specifically says, make

25   representations for improvements.  So that fits squarely

1    with what her job was.  The fact that it was appreciated

2    is demonstrated by the fact that the recommendations were

3    accepted, and there's examples in the record of that.

4         So all of the things that she does were

5    discretionary even though that many of them are aided by

6    guidelines and protocols and criteria.

7         The last one I mentioned was not at all, but

8    even those that are aided by guidelines and criteria and

9    protocol, the regulations very specifically talk about how

10   the use of guidelines and protocol does not rob an

11   individual of discretion and independent judgment if the

12   guidelines are technical and require knowledge and

13   experience in order to interpret.

14        There are examples in the record of the types of

15   guidelines that Ms. Isett applied.  It would not take more

16   than a few seconds to look at those guidelines and fully

17   appreciate how incredibly technical they are, and how no

18   layperson could ever apply those guidelines without the

19   type of training and education and experience that someone

20   with an RN degree has, or a higher level has.

21        So, Your Honor, in closing, two exemptions.  We

22   do bear the burden, but we've satisfied our burden under

23   both of these exemptions.  All we have to do is satisfy

24   one.  We don't have to satisfy both.  We do satisfy both,

25   so summary judgment in our favor is warranted.

1          THE COURT:  Does it strike you as surprising

2     that courts would reach differing conclusions with regard

3     to whether utilization review is within the learned

4     professional exemption?

5          MR. LAMPE:  I'm not surprised by that, given the

6     fact that companies can structure their jobs differently.

7          Again, I go back to the point in Centene, when

8     the manager from the company testified, and it was cited

9     in the decision, that the type of decisions that are being

10    made are very ministerial, very straightforward, no

11    discretion involved.  And if that's the case, then it

12    wouldn't be surprising that an LPN could do that.

13         But the managers in this case have testified

14    very differently, and the plaintiff herself has testified

15    very differently.

16         The Centene defendant had different guidelines,

17    different protocols, compared to Aetna, so it's hard to

18    draw conclusions across different companies in that

19    regard.

20         THE COURT:  Is that apparent from the face of

21    the Centene decision or published decisions?

22         MR. LAMPE:  The Fifth Circuit decision has a

23    discussion of the fact that the manager from the company

24    testified that the decisions that were being made were

25    very straightforward decisions.  And, yeah, that's in the

1    Fifth Circuit decision.

2              THE COURT:  As I recall it, the court drops a

3    footnote.  I may be mistaken, but I remember a statement

4    by the court suggesting that if Centene's guidelines were

5    not directly on point, the default was to national

6    guidelines or some sort of standard guideline.

7              Does that ring a bell?

8              MR. LAMPE:  Your Honor, I do not recall that.  I

9    wouldn't be surprised there was something like that, if

10   there was a gap filler.  But there's no indication at all,

11   there's simply no record at all, establishing a similarity

12   between these two companies, and so no conclusions can be

13   drawn.

14             The record that is before the Court is that the

15   company itself admitted in Centene that the decisions are

16   very different from what the decisions in the Aetna case

17   are.  For whatever reason, it's not apparent to me, but

18   the Court should not draw conclusions across cases without

19   any sort of a basis for similarity.

20             I'll also note, Your Honor, and I'm sure you're

21   aware of this, that the regulations -- the very beginning

22   of Section 541, which I left over there, specifically

23   have -- I think it's the very second session which talks

24   about job title.  And it says, decisions about exempt

25   status should not be made based on job titles.  And the

1    fact that a utilization review nurse for one company was

2    found not to be exempt by a court there, the fact that

3    it's the same job title should not be something the Court

4    looks at in deciding whether they're exempt elsewhere.

5    Titles are very broad, encompass lots of different things,

6    companies use them very differently.

7              So I would submit that that case is limited to

8    its facts, and there's no reasons for drawing any

9    conclusions based on Centene.

10              THE COURT:  Thank you.

11              MR. LAMPE:  Thank you, Your Honor.

12              MS. BAILEY:  May I, Your Honor?

13              THE COURT:  Well, that raises the question, who

14    gets the last word, but yes, I'll give you a couple of

15    minutes.

16              MS. BAILEY:  Thank you.

17              I agree with opposing counsel that job titles

18    don't matter, just like it doesn't matter that Aetna

19    decided to classify all of its RNs as appeals nurse

20    consultants and all of its LPNs as appeals nurse

21    associates.

22              Pippins conversation about popularity, that is

23    for those unique circumstances where one or two, as

24    opposing counsel said, stray cases don't actually meet the

25    educational requirement, like lawyers who don't go to law

1    school but are still licensed.

2          It's very clear in Clark versus Centene, it's

3    very clear it wasn't meant to encapsulate jobs where whole

4    groups don't meet the educational work requirement.  That

5    doesn't help here.

6          Remember, Pippins was a situation where the

7    plaintiffs were trying to say that all entry-level

8    accountants, auditors, were nonexempt.  Like because

9    you're green and new at your job, you can't be a

10   professional.  Obviously lawyers can be very green, but we

11   all had the requisite training to learn how to think like

12   a lawyer and practice law, and that's not for the

13   professional exemptions and so Pippins is very

14   distinguishable.

15         But the Pippins court also told us that a

16   company like Centene can't just require a particular type

17   of educational degree and make that the requirement.  They

18   use the analogy:  You can't require all journalists have

19   PhDs and, therefore, they are professionally exempt.  The

20   fact that Aetna decided to require all consultants be RNs

21   is not dispositive of the issue.

22         And, Your Honor, you asked whether the ability

23   of plaintiff to make an independent unsupervised decision

24   brings her within the exemption, and the answer is no,

25   vis-a-vis Clark, because LPNs made independent decisions

1        in that case, but also because decisions made by these

2        nurses are still constrained by guidelines.

3               It is -- I agree with my colleague -- it is

4        highly technical work.  It's work that requires some

5        clinical experience.  It requires extensive training to

6        read the medical files.

7               But as a court in Illinois recently told us, to

8        be able to understand the terminology and read these files

9        isn't enough to make it the type of advanced knowledge

10       that's routinely and customarily exercised by RNs.

11              So with that, just one point as to the

12       administrative exemption.

13              This wasn't an escalated second-step review.

14       The appeals nurses looked at it as new, usually with new

15       information.  Because once a request is kicked, a reason

16       or rationale is given to the member provided, and they

17       initiate the appeal with additional information necessary.

18              So they are not reviewing the lower level or the

19       first-level utilization review work.  They are starting

20       anew.  That's very clear.  They are still considered

21       frontline workers by the quality department head at Aetna.

22              So for those reasons plaintiffs should succeed,

23       Your Honor.  Thank you.

24              THE COURT:  Thank you.

25              MR. LAMPE:  Nothing further, Your Honor.

1              THE COURT:  All right.  Thank you all very much.

2  I appreciate you all coming in today.

3                   (Proceedings adjourned at 10:51 a.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3                In Re: ISETT vs. AETNA, INC

4

5

6              I, Darlene A. Warner, RDR-CRR, Official Court

7    Reporter for the United States District Court for the

8    District of Connecticut, do hereby certify that the

9    foregoing pages are a true and accurate transcription of

10   my shorthand notes taken in the aforementioned matter to

11   the best of my skill and ability.

12

13

14

15
                     /s/_____
16
                        DARLENE A. WARNER, RDR-CRR
17                       Official Court Reporter
                        450 Main Street, Room #223
18                      Hartford, Connecticut 06103
                           (860) 547-0580
19

20

21

22

23

24

25