

# UNITED STATES COURT OF APPEALS
## FOR THE
## SECOND CIRCUIT

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 14th day of January, two thousand twenty.

Before:       José A. Cabranes,
               Reena Raggi,
                  *Circuit Judges,*
               Edward R. Korman,
                  *District Judge.\**

_____

Sharon Isett, individually and on behalf of all other similarly situated individuals,

        Plaintiff - Appellant,

v.

Aetna Life Insurance Company,

        Defendant - Appellee,

Aetna, Inc., Aetna Health of California, Inc., Aetna Medicaid Administrators, LLC, American Health Holding, Inc.,

        Defendants.

_____

**JUDGMENT**

Docket No. 18-3271

The appeal in the above captioned case from a judgment of the United States District Court for the District of Connecticut was argued on the district court's record and the parties' briefs. Upon consideration thereof,

IT IS HEREBY ORDERED, ADJUDGED and DECREED that the district court's September 30, 2018 judgment is AFFIRMED.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

For the Court**:**
Catherine O'Hagan Wolfe,
Clerk of Court

\*Judge Edward R. Korman, of the United States District Court for the Eastern District of New York, sitting by designation.

18-3271-cv
*Isett v. Aetna Life Insurance Company*

# In the
# United States Court of Appeals
## for the Second Circuit

———

AUGUST TERM 2019

No. 18-3271-cv

SHARON ISETT, INDIVIDUALLY AND ON BEHALF OF ALL OTHER
SIMILARLY SITUATED INDIVIDUALS,
*Plaintiff-Appellant*,

v.

AETNA LIFE INSURANCE COMPANY,
*Defendant-Appellee*,

AETNA, INC., AETNA HEALTH OF CALIFORNIA, INC., AETNA MEDICAID
ADMINISTRATORS, LLC, AMERICAN HEALTH HOLDING, INC.
*Defendants.*

———

On Appeal from the United States District Court
for the District of Connecticut

———

ARGUED: OCTOBER 31, 2019
DECIDED: JANUARY 14, 2020

———

Before: CABRANES, RAGGI, *Circuit Judges*, and KORMAN, *Judge*.[*]

———————

Plaintiff-Appellant Sharon Isett ("Isett") appeals from an award of summary judgment entered in the United States District Court for the District of Connecticut (Robert N. Chatigny, *Judge*) in favor of her employer, Defendant-Appellee Aetna Life Insurance Company ("Aetna"). The question presented in this case is whether Isett, a registered nurse who does not work in a clinical setting, but who reviews Aetna's denials of claims for insurance coverage of medical services; determines whether the requested services are in fact medically necessary; and, if so, approves such claims without further review from a physician, is a professional employee exempt from the Fair Labor Standards Act's ("FLSA") overtime-pay requirement or a non-professional employee entitled to overtime compensation. Therefore, in this appeal, we address the applicability of the FLSA's professional exemption to an employee who acts in a manner consistent with the central characteristics of the profession at issue but does so outside of that profession's traditional employment setting.

On *de novo* review, we conclude, as the District Court did, that Isett is an FLSA-exempt professional and, therefore, the judgment in favor of Aetna is **AFFIRMED.**

———————————

[*] Judge Edward R. Korman, of the United States District Court for the Eastern District of New York, sitting by designation.

———————

ADAM W. HANSEN, Apollo Law, LLC
(Eleanor E. Frisch, Apollo Law, LLC;
Rachhana T. Srey, Nichols Kaster, PLLP, *on
the brief*), Minneapolis, MN, *for Plaintiff-
Appellant*.

MATTHEW W. LAMPE (Wendy C. Butler, *on
the brief*) Jones Day, New York, NY, *for
Defendant-Appellee*.

———————

JOSÉ A. CABRANES, *Circuit Judge*:

Plaintiff-Appellant Sharon Isett ("Isett") is a registered nurse who sued her employer, Defendant-Appellee Aetna Life Insurance Company ("Aetna") for unpaid overtime compensation under the Fair Labor Standards Act ("FLSA").[1] Isett now appeals from a judgment entered on September 30, 2018, in the United States District Court for the District of Connecticut (Robert N. Chatigny, *Judge*) in favor of Aetna, on the grounds that Isett is a professional who is not entitled to overtime compensation under the FLSA. On appeal, Isett challenges the District Court's conclusion that her duties qualify for the professional exemption.

———————

[1] 29 U.S.C. §§ 201–219.

Under the FLSA, employees who work more than forty hours per week generally are entitled to additional compensation for those excess hours.[2] There are certain employees, however, who are not eligible to receive this additional compensation. Among these exempt employees are "professionals," those who work in a bona fide professional capacity.[3] Professionals are those workers who use specialized knowledge in a field of science or learning, which is typically obtained through intellectual instruction that generally results in an academic degree.[4]

Ordinarily, registered nurses are classified properly as professionals.[5] The question presented in this case is whether a registered nurse who does not work in a clinical setting, but who reviews denials of claims for insurance coverage of medical services; makes determinations of whether the requested services are in fact medically necessary; and, if so, approves such claims where appropriate without further review from a physician, is a professional employee exempt from the FLSA's overtime-pay requirement or a non-professional employee entitled to overtime compensation. Therefore, in this appeal, we address the applicability of the FLSA's professional exemption to an employee who acts in a manner

---

[2] *See id.* § 207(a)(1).

[3] *See id.* § 213(a)(1).

[4] *See* 29 C.F.R. § 541.301(a).

[5] *See id.* § 541.301(e)(2).

4

consistent with the central characteristics of the profession at issue but does so outside of that profession's traditional employment setting.

On *de novo* review, we conclude, much for the same reasons stated in the District Court's careful and well-reasoned decision, that the professional exemption applies. Accordingly, the September 30, 2018 judgment in favor of Aetna is **AFFIRMED**.

## I.     BACKGROUND

We draw the facts, which are undisputed, from the District Court's recitation and the record before us.[6]

### A. The Parties' Relationship

Isett worked as an appeals nurse consultant in Aetna's National Clinical Appeals Unit from 2011 to 2016. Most employees in the National Clinical Appeals Unit fall under one of three job categories: (1) appeals nurse associates ("nurse associates"), who must hold a certificate as licensed practical nurses and are paid on an hourly basis, including overtime premiums; (2) appeals nurse consultants ("nurse consultants"), like Isett, who must hold a license as registered nurses, are paid on a salary basis, and are classified as exempt from the FLSA's overtime protections; and (3) medical directors, who are physicians.

Nurse associates and nurse consultants, jointly, "appeals nurses," are responsible for reviewing claims for health insurance

---

[6] *See Isett v. Aetna Life Ins. Co.*, No. 3:14-cv-1698 (RNC), 2018 WL 4697278, at *1 (D. Conn. Sept. 30, 2018).

5

benefits that one of Aetna's departments initially denied. More specifically, appeals nurses review appeals seeking authorization for medical services not yet rendered which are transmitted to the Appeals Unit when a clinical determination of medical necessity is required. This process is known as "utilization review."

On any given appeal where utilization review is conducted, appeals nurses must review the patient's file, which typically includes the patient's clinical information and the documentation from the initial review resulting in the claim's denial. The appeals nurses then locate the relevant criteria in Aetna's clinical guidelines and apply the criteria to the information in the file to analyze whether the requested services are medically necessary. Any conclusions must be documented in a template form provided by Aetna.

If the request for coverage does not meet the relevant criteria, the appeals nurses must forward the appeal to a medical director for further review and a final decision. Similarly, if the appeals nurses conclude that it is unclear whether the request meets the relevant criteria, the appeal is forwarded to a medical director. Only medical directors are authorized to deny insurance coverage for medical reasons.

Despite all these similarities in the work of the appeals nurses, only nurse consultants can authorize insurance coverage. Subject to some minor exceptions depending on, for example, the subject matter of the requested benefit, whenever a nurse consultant concludes that a request satisfies the relevant criteria in Aetna's clinical guidelines,

the nurse consultant also will approve the request for coverage without further review. By contrast, if a nurse associate reaches the same conclusion, Aetna requires the nurse associate to forward the appeal to a nurse consultant or a medical director to review the work and make the final decision regarding coverage. In short, nurse consultants, unlike nurse associates, are authorized to make a final *affirmative* determination of medical necessity, thereby approving coverage for a patient's requested service and binding Aetna to pay for the service.

Isett worked remotely from home without much day-to-day oversight. On average, she would speak to her supervisor over the phone approximately less than once a week and never met her supervisor in person. In performing her work, Isett relied on her knowledge and experience as a registered nurse, as well as Aetna's in-house training.

### B.  Procedural History

Isett filed the complaint in this case on behalf of herself and all other similarly situated individuals, alleging that Aetna unlawfully misclassified her as exempt from the FLSA's overtime protections. Twenty-eight employees joined the action as opt-in plaintiffs. Aetna answered, arguing that Isett was classified properly as exempt under the FLSA's professional and administrative exemptions.[7] At the

---

[7] The FLSA also exempts from its overtime-pay requirement any employee employed in a bona fide administrative capacity. *See* 29 U.S.C. § 213(a)(1). Administrative employees are those who are "[c]ompensated on a salary or fee

direction of the District Court, Isett and Aetna filed cross-motions for summary judgment addressing only the application of both exemptions to Isett's individual claim.

On September 30, 2018, the District Court granted Aetna's motion for summary judgment and denied Isett's cross-motion for partial summary judgment. The District Court held that the professional exemption applies to Isett's job and thus declined to address the applicability of the administrative exemption; it thereupon entered final judgment in favor of Aetna and dismissed the case. By stipulation of the parties, the 28 opt-in plaintiffs were dismissed without prejudice. This appeal followed.

## II.    DISCUSSION

On appeal, Isett challenges the District Court's conclusion that the FLSA's professional exemption applies to her job as a nurse consultant and argues that Aetna failed to prove, in the alternative, that her job qualified for the administrative exemption. We affirm the District Court's judgment that Isett was classified properly as exempt under the professional exemption, and likewise, decline to address

---

basis" pursuant to certain salary requirements, and whose primary duty: (1) "is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers"; and (2) "includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200; *accord Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529 (2d Cir. 2009).

Case 18-3871, Document 133, 02/05/2020, 2759551, Page10 of 35

Aetna's alternative argument regarding the administrative exemption's applicability.

## A. The FLSA and the Professional Exemption

Congress enacted the FLSA to protect "the minimum standard of living necessary for health, efficiency, and general well-being of workers."[8] The FLSA seeks to accomplish this broad purpose, in part, by requiring that employees who work more than forty hours per week be compensated for those excess hours at a higher rate.[9] The FLSA, however, also excludes certain classes of employees from its overtime-pay requirement. One of those exempted classes consists of any "employee employed in a bona fide . . . professional capacity."[10]

Although the FLSA does not define the term "professional capacity," Congress authorized the Secretary of Labor ("Secretary") to "defin[e] and delimi[t]" the scope of the professional exemption.[11] The Secretary's regulations provide, in relevant part, that a "professional" is any employee whose primary job duty requires "knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction."[12]

---

[8] 29 U.S.C. § 202(a).

[9] *See id.* § 207(a)(1).

[10] *Id.* § 213(a)(1).

[11] *Id.*

[12] 29 C.F.R. § 541.300(a)(2)(i). The governing regulations also require that a "professional" be an employee who is "[c]ompensated on a salary or fee basis"

Accordingly, to qualify for the exemption, the employee must satisfy a "primary duty test" consisting of three factors or prongs: (1) the work requires "advanced knowledge," (2)"in a field of science or learning," (3) "customarily acquired by a prolonged course of specialized intellectual instruction."[13]

Regarding the professional exemption's application to nurses, the Secretary's regulations provide that "[r]egistered nurses who are registered by the appropriate State examining board generally meet the duties requirements for the learned professional exemption."[14] By contrast, "licensed practical nurses or other similar health care employees . . . generally do not qualify as exempt learned professionals because possession of a specialized advanced academic degree is not a standard prerequisite for entry into such occupations."[15]

"All three prongs" of the primary duty test "must be satisfied for the learned professional exemption to apply."[16] Moreover, the employer bears the burden of proving that the employee qualifies for

---

pursuant to certain salary requirements. *Id.* § 541.300(a)(1). Because there is no question that Isett satisfies the salary test, we do not address this separate requirement.

[13] *Id.* § 541.301(a).

[14] *Id.* § 541.301(e)(2).

[15] *Id.*

[16] *Pippins v. KPMG, LLP*, 759 F.3d 235, 238 (2d Cir. 2014).

the exemption.[17] In interpreting the scope of the FLSA exemptions, we stated as recently as 2014 that the "FLSA exemptions are to be 'narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit.'"[18] Thereafter, however, the Supreme Court characterized this "narrow-construction principle" as "flawed," as it mistakenly presumes "that the FLSA pursues its remedial purpose at all costs," notwithstanding that the FLSA "exemptions are as much a part of the FLSA's purpose as the overtime-pay requirement."[19] As a result, the Supreme Court instructed that we "have no license to give the [professional] exemption anything but a fair reading."[20] We do so here.[21]

---

[17] *Flood v. Just Energy Mktg. Corp.*, 904 F.3d 219, 227 (2d Cir. 2018).

[18] *Pippins*, 759 F.3d at 238 (quoting *Bilyou v. Dutchess Beer Distribs., Inc.*, 300 F.3d 217, 222 (2d Cir. 2002)). We have invoked this narrow-construction principle more recently in a non-precedential summary order. *See Domenech v. Parts Authority, Inc.*, 653 F. App'x 26, 27 (2d Cir. 2016) (citation omitted).

[19] *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018) (internal quotation marks and citations omitted).

[20] *Id.*; *accord Flood*, 904 F.3d at 228 (recognizing that the application of the narrow-construction principle to the FLSA exemptions "is not the rule anymore").

[21] In deciding this case, we rely primarily on *Pippins*, which did reference the narrow-construction principle but provided a careful and fair reading of the FLSA-implementing regulations relating to the professional exemption, as required by *Encino*.

11

Isett does not dispute the fact that her work as an appeals nurse consultant is "in a field of science or learning," as required by the second prong of the primary duty test.[22] She does argue, however, that Aetna failed to prove that her job as a nurse consultant satisfies the first and third prongs. Therefore, Isett asks us to decide whether a nurse consultant uses "knowledge of an advanced type" that is "customarily acquired by a prolonged course of specialized intellectual instruction."[23]

With respect to the first prong, Isett contends that nurse consultants do not perform work requiring advanced knowledge because they are not practicing registered nurses and do not perform the clinical duties that give nursing its professional character. Isett characterizes utilization review as "more routine mental work than predominantly intellectual in character."[24] Aetna, in response, asserts that Isett mischaracterizes her job. It contends that nurse consultants use the advanced knowledge typical of other registered nurses in approving insurance coverage for medically necessary services.

As to the third prong, Isett contends that her job did not require specialized academic instruction and could be performed by anyone with proper training. Isett states that nurse associates, who are licensed practical nurses and possess only a year of technical

---

[22] 29 C.F.R. § 541.301(a).

[23] *Id.* § 541.300(a)(2)(i).

[24] Appellant's Br. at 53.

education, can—and do—perform utilization review. Aetna responds that nurse associates do not perform the same job as nurse consultants.

## B.  Standard of Review

We review Isett's challenge to the District Court's "grant of summary judgment *de novo*, resolving all ambiguities and drawing all reasonable inferences" in her favor.[25] We will affirm a summary judgment "only if there is no genuine dispute as to any material fact and . . . the movant is entitled to judgment as a matter of law."[26]

The question of whether the professional exemption applies in particular circumstances "is a mixed question of law and fact."[27] Specifically, the question of how an employee spends her "working time is a question of fact" and the question of whether an employee's primary duty excluded her "from the overtime benefits of the FLSA is a question of law."[28] Because the parties agree that the relevant, material facts are not disputed—particularly, how Isett spent her working time—we turn to the legal question of whether her primary

---

[25] *Pippins*, 759 F.3d at 239 (internal quotation marks and citation omitted).

[26] *Id.* (internal quotation marks and citations omitted).

[27] *Id.* (quoting *Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 558 (2d Cir. 2012) ("The exemption question under the FLSA is a mixed question of law and fact." (internal quotation marks and citation omitted)).

[28] *Id.* (quoting *Ramos*, 687 F.3d at 558); *accord Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986).

duty as a nurse consultant placed her beyond the FLSA's overtime protections.

## C. First Prong of the Primary Duty Test

### 1. The Advanced-Knowledge Requirement

We take up first Isett's argument that her primary duty as a nurse consultant does not require advanced knowledge for purposes of the professional exemption.

The Secretary of Labor's regulations define "work requiring advanced knowledge" as "work which is predominantly intellectual in character, and which includes work requiring the consistent exercise of *discretion and judgment*, as distinguished from performance of routine mental, manual, mechanical or physical work."[29] The regulations further explain that an employee performing such work "generally uses the advanced knowledge to analyze, interpret, or make deductions from varying facts or circumstances."[30]

In *Pippins v. KPMG, LLP*, in 2014, we first addressed the meaning of the "advanced knowledge" prong and explored its contours by interpreting the phrase "discretion and judgment," which

---

[29] 29 C.F.R. § 541.301(b) (emphasis added).

[30] *Id.*

"does not receive further elaboration in the regulations."[31] We noted that there is a similar term—"discretion and independent judgment"—in the Secretary's regulations defining the administrative exemption.[32] The term "discretion and independent judgment" in the context of administrative work is manifested by, among other things, the "authority to commit the employer in matters that have significant financial impact . . . to waive or deviate from established policies and procedures without prior approval," or "to negotiate and bind the company on significant matters."[33]

We declined to import that definition into the professional exemption because professional "discretion and judgment" is "of a different character" altogether, as it is based on expertise, special knowledge, or talents characteristic of the profession at issue.[34] We agreed with the Secretary's 2004 interpretation of her own regulations that "the discretion and judgment standard for the professional

---

[31] *Pippins*, 759 F.3d at 240 ("We have not yet had occasion to elaborate on the meaning of the 'advanced knowledge' prong of the learned professional exemption.").

[32] *Id*. (citing 29 C.F.R. § 541.200(a)(3) (stating that an administrative employee is one "[w]hose primary duty includes the exercise of *discretion and independent judgment* with respect to matters of significance") (emphasis added)).

[33] 29 C.F.R. § 541.202(b).

[34] *Pippins*, 759 F.3d at 241–42.

exemption is 'less stringent' than the discretion and independent judgment standard of the administrative exemption."[35]

With this background in mind, *Pippins* held that junior audit associates who perform "entry-level accounting tasks" under close supervision and who "are automatically promoted to a more senior accounting position after two years of satisfactory employment" use "advanced knowledge" in their work and are properly classified under the professional exemption.[36]

As relevant here, the principal lessons of *Pippins* are two-fold. *First*, the burden of satisfying the professional exemption's advanced-knowledge requirement by application of the "discretion and judgment" standard is not particularly stringent, at least when compared to the "discretion and independent judgment" standard applicable to administrative employees. *Second*, the advanced-knowledge inquiry does not take place in a vacuum. In conducting the inquiry, we do not necessarily look to the freedom of an employee to deviate from the employer's policies. Rather, "the professional exemption requires the exercise of [discretion and] judgment *characteristic of the learned profession at issue*."[37]

---

[35] *Id.* at 241 (quoting *Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, the Preamble to the 2004 Final Rule*, 69 Fed. Reg. 22122, 22151 (April 23, 2004)).

[36] *Id.* at 237–38.

[37] *Id.* at 243 (emphasis added).

We have not yet had occasion to apply the analytical framework of *Pippins,* or to elaborate on its scope, in the context of professional work performed in non-traditional settings (*e.g.*, a registered nurse conducting utilization review for an insurance company). Accordingly, we take this opportunity to clarify that, with respect to the first prong of the primary duty test, the rule of *Pippins* is best understood as follows: an employee uses "advanced knowledge" for purposes of the professional exemption under the FLSA if the employee acts in a manner that requires the discretion and judgment characteristic of an employee practicing the profession at issue.

Therefore, in applying the advanced-knowledge requirement, we conduct a two-step inquiry: (1) we identify what qualities or skills are characteristic of the profession at issue (in this instance, registered nursing); and (2) we determine whether these distinctive qualities or skills are manifested in the performance of the employee's primary duty (here, conducting utilization review and approving insurance coverage for medically necessary services).

## 2. Step One: The Advanced-Knowledge Requirement as Applied to Registered Nurses

There is no dispute that registered nurses typically use advanced knowledge in the exercise of their profession.[38] Indeed, the

---

[38] *See* Appellant's Br. at 33–34, 51–52 (conceding that registered nurses working in a clinical setting use advanced knowledge and generally qualify for the professional exemption).

work of registered nurses is predominantly intellectual in character, as they use their special knowledge and skills to analyze, interpret, or make deductions from varying circumstances relating to each individual patient.[39] For that reason, the Secretary's regulations provide that "[r]egistered nurses who are registered by the appropriate State examining board generally meet the duties requirements for the learned professional exemption."[40]

Under *Pippins*, however, "[w]e must still . . . identify what qualities are characteristic of the work of [a registered nurse]."[41] Registered nurses, like many professionals, perform their work in a variety of different settings. Isett's challenge raises the threshold question of whether it is only the performance of traditional clinical duties—*e.g.*, bedside nursing, guiding medical treatment, administering medications, performing diagnostic tests, and analyzing results—that endows registered nurses with a status we describe as "professional." We conclude that it is not, for at least three reasons.

---

[39] *See, e.g., Williams v. Genex Servs., LLC*, 809 F.3d 103, 110–11 (4th Cir. 2015); *Rieve v. Coventry Health Care, Inc.*, 870 F. Supp. 2d 856, 863 (C.D. Cal. 2012); *Withrow v. Sedgwick Claims Mgm't Serv., Inc.*, 841 F. Supp. 2d 972, 987 (S.D. W. Va. 2012); *Mudgett v. Univ. of Pittsburgh Med. Ctr.*, 09-cv-254 (WLS), 2010 WL 1838413, *7–*8 (W.D. Pa. May 6, 2010); *Powell v. Am. Red Cross*, 518 F. Supp. 2d 24, 40–43 (D.D.C. 2007).

[40] 29 C.F.R. § 541.301(e)(2).

[41] *Pippins*, 759 F.3d at 244.

18

*First*, the pertinent regulation relating to nurses, by its express terms, does not limit its characterization of registered nurses as professionals to those who perform clinical work directly with patients.[42] Had the Secretary of Labor intended to include such a limitation, the Secretary could have done so. We decline to read a limitation into the regulation that was so clearly not intended by the Secretary when acting pursuant to Congress's explicit delegation of rule-making authority.[43]

*Second*, the regulations make clear that the advanced-knowledge requirement is met where an employee analyzes, interprets, and makes deductions from varying facts or circumstances—an exercise that stands in stark contrast to routine mental or physical work.[44] There is simply no support for the proposition that only those registered nurses who perform clinical duties use their specialized knowledge, whereas registered nurses who work outside of a clinical setting primarily perform routine mental and physical work. In fact, there are many registered nurses who do not work directly with patients or perform clinical duties—for example, nurse educators, public policy advisors, or researchers—who clearly rely on advanced

---

[42] *See* 29 C.F.R. § 541.301(e)(2).

[43] *See Lin v. U.S. Dep't of Justice*, 459 F.3d 255, 262 (2d Cir. 2006) (refusing "to read" a proposed "limitation into the regulation's text" that is not included in the "plain language of the regulation"); *accord Dean v. United States*, 556 U.S. 568, 572 (2009) (courts must "ordinarily resist reading words or elements into a statute that do not appear on its face" (quoting *Bates v. United States*, 522 U.S. 23, 29, (1997))).

[44] *See* 29 C.F.R. § 541.301(b).

19

knowledge in the performance of their occupational duties.[45] Thus, as Isett herself recognizes, it is not only "clinical work requiring advanced knowledge that gives nursing its professional character."[46]

*Third*, Isett's exclusive focus on "duties" misinterprets the first step of the analytical framework established in *Pippins*. Under this first step, we look to "qualities" or "skills" that reflect the "knowledge of the[ ] specialty to exercise discretion and judgment that is characteristic" of the profession.[47]

---

[45] *See* Nat'l Council of State Boards Nursing Model Act art. III, § 2(b)(6), (12)–(13), https://www.ncsbn.org/14_Model_Act_0914.pdf ("Nursing Model Act") ("The practice of registered nurses shall include . . . [d]esigning and implementing teaching plans based on patient needs," "[t]eaching the theory and practice of nursing," and "[p]articipating in development of health care policies, procedures and systems").

[46] Appellant's Br. at 52 (recognizing that the "fact that Appeals Nurse Consultants do not engage in clinical nursing does not end the analysis, of course"); *cf.* Nursing Model Act, art. III, § 2(b)(10), (15) (stating that registered nursing includes "the management of health care and the implementation of the total health care regimen *within and across care settings*," as well as "[o]ther acts that require education and training consistent with professional standards . . . commensurate with the [registered nurse's] education, demonstrated competencies and experience") (emphasis added).

[47] *Pippins*, 759 F.3d at 243. In *Pippins*, for example, we did not consider only specific accountancy-related tasks that professional accountants perform to determine if they are also performed by junior audit associates. Rather, in "identify[ing] what qualities are characteristic of the work of an accountant," we looked at accounting tasks generally to conclude that "central to the profession [of accounting] is the application of appropriate professional skepticism." *Id.* at 244 (internal quotation marks and citations omitted).

Isett's own description of the duties that registered nurses typically perform[48] makes clear that the practice of registered nursing is characterized primarily by the ability to act independent of direction, or under minimal supervision, on the basis of collected clinical data.[49] Licensed practical nurses collect patient clinical data and likely even analyze it, but are not trained to interpret it in a way that allows them to act independently or without direct supervision.[50]

---

[48] *See* Appellant's Br. at 50–51 (describing the duties of registered nurses as consisting primarily of bedside nursing, supervision and administration of patient care, and the education of patients and family members on how to implement a health care regimen) (citing U.S. BUREAU OF LABOR OF STATISTICS, *Occupational Outlook Handbook, Registered Nurses: What They Do*, https://www.bls.gov/ooh/healthcare/registered-nurses.htm#tab-2).

[49] *See, e.g.*, Nursing Model Act art III, § 2(b) (describing "[t]he practice of registered nurses" as including, for example, "[p]roviding comprehensive nursing assessment of the health status of patients," "[i]mplementing nursing care through the execution of independent nursing strategies," "[d]elegating and assigning nursing interventions to implement the plan of care," and "[m]anaging, supervising, and evaluating the practice of nursing"); N.Y. STATE EDUC. DEP'T, OFFICE OF THE PROFESSIONS, *The Differentiated Scope of Practice of Licensed Practical Nurses (LPNs) and Registered Professional Nurses (RNs)*, http://www.op.nysed.gov/prof/nurse/nurse-scope-lpn-rn.htm ("*Differentiated Scope of Nursing Practice*") (explaining that registered nurses are authorized to "execute medical orders" and "may function independently in providing nursing care" in different areas) (citing N.Y. Educ. Law. art 139, §§ 6901–02)); Conn. Gen. Stat. § 20-87a(a) (defining the practice of registered nursing in similar terms).

[50] *See, e.g.*, Nursing Model Act art. III, § 1(b)("A [licensed practical nurse] practices . . . under the supervision of a [registered nurse], advanced practice registered nurse . . ., licensed physician or other health care provider authorized by the state . . . ."); *Differentiated Scope of Nursing Practice* (explaining that licensed practical nurses "may not interpret patient clinical data or act independently on such data," and "function by law in a dependent role *at the direction of the* [*registered*

The ability to act independently requires substantive command of clinical data, which allows registered nurses, among other things, to provide, supervise, modify, or approve the administration of medically necessary services under limited supervision.[51]

### 3. Step Two: The Advanced-Knowledge Requirement as Applied to Aetna's Nurse Consultants

We now turn to the critical legal question before us: whether nurse consultants act in a manner that reflects the central characteristic of registered nurses. To put it in more precise terms, we must determine whether Isett acted independently—or, at a minimum, under limited supervision—on the basis of collected clinical information when she approved insurance coverage of medical services. Upon review of the undisputed material facts presented to us, we conclude that she did.

Isett's role in the utilization review process consisted of examining a patient's file, applying medical criteria found in highly technical guidelines to a patient's unique and varying facts,

---

*nurse*] or other select authorized health care providers") (emphasis added); Conn. Gen. Stat. § 20-87a(c) (defining the scope of practice of licensed practical nurses "as the performing of selected tasks and sharing of responsibility under the direction of a registered nurse or an advanced practice registered nurse . . . and executing the medical regimen under the direction of a licensed physician or dentist"); Mich. Comp. Laws § 333.17201(b) (same).

[51] To clarify, independence from direction is not an element of the professional exemption's advanced-knowledge requirement. Here, the ability to act under minimal supervision is important to our inquiry only because it is a central characteristic of registered nursing.

Case 1:18-3876, Document 133, 02/05/2020, 2769551, Page24 of 35

determining whether the requested services are medically necessary (so that Aetna should pay for them) and, if appropriate, approving coverage for the medical services. By Isett's own account, she was expected to decide: (1) whether certain medical criteria in the clinical guidelines are satisfied; (2) whether it is unclear if the criteria in the guidelines are satisfied; and (3) whether the clinical guidelines themselves are unclear.

Although nurse associates also are expected to make these decisions as part of the utilization review process, none of the decisions made by the nurse associates are done independently or without supervision. When it comes to the work of appeals nurse associates, medical directors invariably have the last word, as none of the nurse associates' decisions is final and binding on Aetna or its insured population. Nurse consultants, however, have the authority to make a final *approval* decision or to forward the file to a medical director. In doing so, nurse consultants act independent of direction from the medical directors.[52]

That nurse consultants can approve coverage, but nurse associates cannot, is *not* merely a "formal" distinction, as Isett contends. Medical directors are required to review *de novo* the work of

_____

[52] Like most professionals, Isett had a supervisor who would provide advice if needed. And Aetna also conducted routine quality audits of the appeals nurses' completed work. Notably, however, Isett worked remotely from home and spoke to her supervisor less than once a week. And the auditors, who were separate and distinct from the Appeals Unit, had no supervision authority over Isett.

nurse associates and correct any mistakes in their review. By contrast, even if mistaken, a nurse consultant's decision can be final and binding, thereby *substantively* affecting the benefits that an insured patient will receive and the sums that Aetna is required to pay.[53]

Nurse consultants "deploy advanced knowledge and practice professional judgment precisely in order to identify the unique circumstances that necessitate seeking further advice" or transferring the file to a medical director.[54] Being able to identify those circumstances in which intervention by a medical director may be appropriate is an exercise of advanced knowledge that nurse associates are not expected to possess. After all, "[i]t is a hallmark of informed professional judgment to understand when a problem can be dealt with by the professional herself" (*i.e.*, a nurse consultant), "and when the issue needs to be brought to the attention of a senior

---

[53] Isett contends that, at least more than once, nurse associates were authorized temporarily to approve requests for coverage—albeit under the signature, and at the behest, of a nurse consultant. Assuming such approvals were made, there is no reasonable basis to infer that nurse associates were acting independently since a nurse consultant was signing the approval decision. And even if there were some isolated instances in which nurse associates were making final decisions independently, such instances simply meant that a nurse associate was performing professional work improperly. No one would argue, for example, that a paralegal's infrequent performance of duties belonging to a first-year associate at a law firm relegates the first-year associate to the role of non-professional staff. The same conclusion applies here.

[54] *Pippins*, 243 F.3d at 248.

colleague" (*i.e.*, a medical director) "with greater experience, wisdom, or authority."[55]

Moreover, "[t]hat the tasks can be broken down into component parts, and that [nurse consultants] are provided with step-by-step instructions for performing their functions effectively does not mean that in performing these tasks [nurse consultants] do not demonstrate" their ability to act independently on the basis of clinical data "and [the] trained intellect that is characteristic of" registered nurses.[56] "Breaking down tasks into their component parts so that they can be described in the most banal way possible obscures the judgment that is called for in determining if workers are learned professionals."[57]

In belittling the significance of her own duties, Isett makes a series of arguments aimed at proving the following syllogism: nurse consultants essentially do the same work that nurse associates do; everyone agrees that nurse associates are not professionals; *ergo*, nurse

---

[55] *Id*. Isett also argues that registered nurses working with patients can deviate from medical guidelines and can make decisions regardless of the guidelines' clarity, whereas nurse consultants are much more constrained in their decisions. But that argument presents a question of *degree*, not *kind*. The crucial point is that the work of nurse consultants requires them to act independently on the basis of collected clinical data. *Cf. id.* at 247–48. (explaining that, even though audit associates are more constrained than accountants in the performance of their duties, audit associates still "apply the skepticism characteristic of the accounting profession").

[56] *Id.* at 246.

[57] *Id.*

consultants are not professionals. But as we have explained, nurse consultants and nurse associates do *not* perform the same job. Therefore, we reject Isett's arguments as unpersuasive and the syllogism as flawed.

Finally, Isett's reliance on *Rego v. Liberty Mutual Managed Care, LLC*,[58] an out-of-circuit, district-court decision holding that a registered nurse conducting utilization review was not a professional, is misplaced, if not mistaken altogether. *Rego*'s holding rests on the mistaken legal premise—foreclosed by *Pippins*—that because the nurses' work "did not involve the consistent exercise of discretion and judgment" for purposes of the administrative exemption, the nurses "did not, by definition, engage in work requiring advanced knowledge."[59]

As stated above, the professional exemption's "discretion and judgment" standard is less stringent than the administrative

---

[58] 367 F. Supp. 3d 849, 859–62 (E.D. Wis. 2019).

[59] *Id.* at 859 (internal quotation marks and citation omitted). *Rego* further compounds the error by relying on *Clark v. Centene Company of Texas, L.P.*, 656 F. App'x 688 (5th Cir. 2016), an unpublished and non-precedential decision of the Fifth Circuit that Isett also relies upon to support her position. *See id.* at 689 (establishing that the "opinion should not be published and is not precedent except under" the doctrine of res judicata, collateral estoppel, or law of the case) (citing 5th Cir. R. 47.5.4.)). *Clark*, which held that case managers conducting utilization review are not professionals, expressly did "not address the first" prong "of the learned professional exemption." *Id.* at 693.

exemption's "discretion and independent judgment" standard.[60] Regardless of the significance of Isett's duties to Aetna's business operations, her ability to decide whether to approve a medical service herself or to forward the case to a medical director reflects the professional discretion and judgment of registered nurses.

*        *        *

In sum, the first prong of the primary duty test of the professional exemption requires courts to: (1) identify the qualities or skills characteristic of the profession at issue; and (2) determine if the employee's primary duty reflects those qualities or skills.

Isett's primary duty as a nurse consultant requires the discretion and judgment characteristic of registered nursing—the ability to act independently, or under limited supervision, on the basis of collected clinical data. Accordingly, we conclude that Isett's job required the use of advanced knowledge, thereby satisfying the first prong of the primary duty test.

---

[60] *See ante* at 16. The exercise of professional discretion and judgment, for example, need not be substantial and consequential. *Compare Pippins*, 759 F.3d at 241 ("[P]rofessionals . . . need not exercise management authority to operate as professionals; what matters is whether they exercise intellectual judgment within the domain of their particular expertise") *with In re Novartis Wage and Hour Litig.*, 611 F.3d 141, 157 (2d Cir. 2010) (explaining that an employee's relatively minor choices are insufficient under the administrative exemption), *abrogated on other grounds by Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142 (2012).

Case 18-3871, Document 123, 02/05/2020, 2759551, Page29 of 35

### D. Third Prong of the Primary Duty Test

It is undisputed that registered nurses, unlike licensed practical nurses, do receive specialized academic instruction and generally satisfy the third prong of the primary duty test. Nevertheless, Isett argues that the duties of a nurse consultant do not require such instruction because her "work can be—and is—performed by" nurse associates.[61] According to Isett, both nurse consultants and nurse associates "acquire the skills needed to review appeals 'by experience rather than by advanced specialized intellectual instruction.'"[62] We disagree. Isett's argument again rests on the flawed premise that nurse associates and nurse consultants perform the same job.

Our focus under the third prong is not circumscribed to the employer's decision to require an advanced academic degree.[63] While the employer's minimum academic qualifications may be relevant—even *highly* relevant—our focus is on the actual duties of the job at issue.[64] Specifically, under this prong, a court must identify the job's

---

[61] Appellant's Br. at 56.

[62] *Id.* (quoting 29 C.F.R. § 541.301(d)).

[63] *Pippins*, 759 F.3d at 251 ("[A] newspaper cannot deprive [journalists] of overtime pay by arbitrarily setting a PhD in literary studies as a condition of hiring.").

[64] *See, e.g., id.*; *Young v. Cooper Cameron Corp.*, 586 F.3d 201, 206 (2d Cir. 2009) (focusing on what the employee's work requires); *Dybach v. Fla. Dept. of Corr.*, 942 F.2d 1562, 1565 (11th Cir. 1991) ("[T]he determinative factor is the job requirement and not the education in fact acquired by the employee").

primary duty to determine if that duty is consistent with the employer's requirement of specialized academic instruction. A primary duty is consistent with the requirement of specialized instruction where the duty calls on advanced knowledge that is typically acquired through a prolonged course of study.[65]

The advanced knowledge of nurse consultants—how to visualize a sick patient to decide, under minimal supervision, whether the patient should be admitted to a hospital, whether the correct level of care was provided, and whether the length of the hospital stay was appropriate—is derived from specialized academic instruction and comparable unsupervised clinical experience, as opposed to mere on-the-job training.[66] Far from being a "distinction without a difference,"[67] the ability to make a final decision about patient care under minimal supervision is precisely what distinguishes registered nurses, whose advanced knowledge is obtained in a prolonged course of specialized study, from licensed practical nurses.[68] Accordingly, we have no difficulty in holding that the primary duty of a nurse consultant is

---

[65] *See Pippins*, 759 F.3d at 250–51.

[66] *See ante* nn. 49–50.

[67] Appellant's Br. at 60.

[68] *See ante* nn. 49–50; *see also Powell*, 518 F. Supp. 2d at 39 (explaining that registered nurses "satisfy[ ] the second and third elements of the primary duty test").

consistent with Aetna's requirement of an advanced academic degree in registered nursing.

Isett argues that "the knowledge (advanced or otherwise) that [a]ppeals [n]urses gained in nursing school bears solely on the question of whether the relevant clinical criteria are satisfied"—a determination that all appeals nurses make.[69] For Isett, the "final step—approving requests when the medical information meets the established criteria—does not require any additional 'prolonged course of specialized intellectual instruction.'"[70] But just as an employee cannot disparage the discretion and judgment employed in his or her work by breaking down tasks into their component parts,[71] an employee cannot break his or her work into separate parts "described in the most banal way possible" to argue that specialized instruction is not necessary to perform each task individually.[72]

Isett's argument that "Aetna's on-the-ground conduct" undermines the distinction drawn between nurse consultants and nurse associates is not to the contrary.[73] The "critical inquiry is not

---

[69] Appellant's Br. at 60.

[70] *Id.*

[71] *See ante* at 25 (citing *Pippins*, 243 F.3d at 246).

[72] *Pippins*, 243 F.3d at 246.

[73] Appellant's Br. at 60 (arguing that Aetna temporarily authorized nurse associates to approve requests for coverage on behalf of nurse consultants who would then sign the approvals); *see ante* at 24 n. 53.

whether there might be a single" or a few nurse associates who purport to perform the same duties as the nurse consultants despite "not satisfy[ing] a specific set of academic requirements, but whether the 'vast majority' of [nurse consultants] required a prolonged, specialized education to fulfill their role."[74] Here, the vast majority of, if not all, nurse consultants at Aetna are registered nurses who, by definition, possess an advanced academic degree.

For that reason, we are not persuaded by Isett's reliance on the Fifth Circuit's non-precedential decision in *Clark*.[75] Unlike here, "the evidence" in *Clark* did "not establish [that] the 'vast majority' of [case managers] hired by [the employer]"—who invariably performed the same job—"received a 'prolonged, specialized education.'"[76] To the

---

[74] *Pippins*, 759 F.3d at 250. The word "customarily" in the third prong of the primary duty test—"customarily acquired by a prolonged course of specialized intellectual instruction," 29 C.F.R. § 541.301(d)—means we look to the "vast majority" of cases in which approval decisions were made by nurse consultants and not the proverbial rare exceptions. *See Young*, 586 F.3d at 205.

[75] *See Clark*, 656 F. App'x at 693–94 (holding that, under the Secretary's regulations, licensed vocational nurses do not satisfy the third prong of the primary duty test) (citing 29 C.F.R. § 541.301(e)(2)).

[76] *Clark v. Centene Co. of Texas, L.P.*, 44 F. Supp. 3d 674, 680 n.5 (W.D. Tex. 2014) (noting that all five named plaintiffs and eleven of the total of thirty opt-in plaintiffs were licensed vocational nurses). Moreover, unlike Aetna's appeals nurses who perform different jobs, all of the case managers in *Clark*—licensed vocational nurses, licensed practical nurses, and registered nurses—approved benefits on the basis of a computer system with "a green light/red light approach." Pls.' Mem. in Supp. of Mot. for Partial Summ. J. at 14, *Clark v. Centene Co. of Texas, L.P.*, No. 1:12-cv-00174 (SS) (W.D. Tex. 2014), ECF No. 113-1.

extent *Clark* can be read to support the notion that registered nurses who independently conduct utilization review and are able to make final approval decisions do not qualify for the professional exemption, we reject the decision as unpersuasive.[77]

*   *   *

To recapitulate, where the employee is required to possess an advanced academic degree, the third prong of the primary duty test triggers a two-step inquiry: (1) identification of the primary duty of the job, which requires the use of advanced knowledge; and (2) determination of whether that duty is consistent with the employer's minimum academic qualifications. The third prong is satisfied where the employee's primary duty calls on advanced knowledge that is acquired in a specialized course of study.

---

[77] *Clark*'s narrow construction of the FLSA exemptions pre-dates the Supreme Court's instruction to afford these exemptions a "fair reading." *Encino Motorcars, LLC*, 138 S. Ct. at 1142. Indeed, its holding stems from a mechanical application of the Secretary's regulations concerning licensed practical nurses to the employer's minimum qualifications for case managers. *See Clark*, 656 F. App'x at 693–94. But that application misunderstands our inquiry under the third prong. As explained above, we identify the primary job duty requiring advanced knowledge and determine if such duty is consistent with the employer's minimum qualifications. *See ante* at 28–29. While *Clark* considered the job's primary duty for purposes of the administrative exemption, it did not do so for purposes of the professional exemption. *See Clark*, 656 F. App'x at 693 (choosing not to "address the first . . . element[ ] of the learned professional exemption"). Similarly, in *Rego*, where all of the nurses performed the same job, the district court considered the primary duty with the administrative exemption in mind and did not account for the unique character of the professional exemption. *See Rego*, 367 F. Supp. 3d at 859.

32

Isett's advanced knowledge, which enabled her to make medical-necessity determinations and approve medical treatment under minimal supervision, is at the core of the specialized training that registered nurses receive before entering their profession. Isett received the training necessary to work as a nurse consultant through a prolonged course of specialized intellectual instruction, thereby satisfying the third prong of the primary duty test.

## III.    CONCLUSION

To summarize, we hold that:

(1) When interpreting the scope of an FLSA exemption, courts must give the exemption a fair reading and shall not construe it narrowly against the employer seeking to assert the exemption.

(2) The first prong of the professional exemption's primary duty test requires courts to: (A) identify what qualities or skills are characteristic of the work of the profession at issue; and (B) determine if the employee's primary duty reflects those qualities or skills.

(3) Central to the profession of registered nursing is the ability to act independently, or under limited supervision, on the basis of collected clinical data.

(4) The District Court did not err in concluding that Isett's job satisfies the first prong of the primary duty test. Isett's primary duty as an appeals nurse consultant—to conduct

Case 18-3871, Document 123, 02/05/2020, 2759551, Page35 of 35

utilization review and approve insurance coverage for medically necessary services under minimal supervision— reflects the discretion and requires the judgment characteristic of other registered nurses. Accordingly, Isett's job as an appeals nurse consultant required the use of advanced nursing knowledge.

(5) In cases where, as here, the employer requires the possession of an advanced academic degree, the third prong of the primary duty test for the professional exemption of the FLSA requires courts to: (A) identify the job's primary duty which requires the use of advanced knowledge; and (B) determine if that duty is consistent with the employer's minimum academic qualifications.

(6) The District Court did not err in concluding that Isett's job satisfies the third prong of the primary duty test. Isett's primary duty calls on advanced nursing knowledge that is at the core of the prolonged course of study that registered nurses receive before entering their profession.

(7) The undisputed facts demonstrate that Isett was properly classified as exempt from the FLSA's overtime-pay requirements because she is a professional under the statute and under the regulations adopted pursuant thereto by the Secretary of Labor.

For the foregoing reasons, the District Court's September 30, 2018 judgment is **AFFIRMED**.

34